THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM J. BUCK, Defendant-Appellant.

Second District    No. 2—03—0625

Opinion filed October 31, 2005.

G. Joseph Weller and Steven E. Wiltgen, both of State Appellate Defender's Office, of Elgin, for appellant.

Paul A. Logli, State's Attorney, of Rockford (Martin P. Moltz and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GROMETER delivered the opinion of the court:

Following a jury trial in the circuit court of Winnebago County,

defendant, William J. Buck, was convicted of first-degree murder (720 ILCS 5/9—1(a)(1) (West 2000)). Although the State sought the death penalty, the jury did not find defendant death-eligible, and the trial court sentenced defendant to 60 years' imprisonment. Defendant appeals his conviction, arguing that the trial judge should have been disqualified because: (a) prior to becoming a member of the bench, he told a member of the media that the death penalty was "appropriate" for the type of crime committed by defendant; (b) the prosecutor supported the judge's election campaign; and (c) the judge had been endorsed by police associations. Defendant also urges reversal of his conviction on the bases that (1) he should have received a pretrial hearing on his death-eligibility; (2) the jury should not have been exposed to the victim's status as a police officer at the guilt-innocence phase of the trial; and (3) the trial court erred in failing to instruct the jury regarding the reliability of electronically recorded confessions. For the reasons that follow, we affirm.

## I. BACKGROUND

During the early morning hours of August 3, 2001, Kevin Rice, an off-duty Rockford police officer, was shot and killed while seated in his parked car. A multiple-count indictment was returned charging defendant with, among other things, first-degree murder in violation of section 9—1(a)(1) of the Criminal Code of 1961 (Code) (720 ILCS 5/9—1(a)(1) (West 2000)). The State sought the death penalty on the basis that Rice was "a peace officer *** killed in the course of performing his official duties *** and the defendant knew or should have known that the murdered individual was a peace officer" (720 ILCS 5/9—1(b)(1) (West 2000)). The case was assigned to Judge Kapala, who appointed a public defender to represent defendant. Judge Kapala later transferred the case to Judge Peterson.

Judge Peterson presided over hearings on several motions, including one in which the defendant sought to demonstrate that the State could not meet its burden of proving any death-eligibility factor. However, on June 13, 2002, prior to issuing a ruling on that motion, Judge Peterson announced that the case would be reassigned because he would be unable to complete the trial prior to his anticipated retirement.

Chief Judge Grubb assigned the matter to Judge Zenoff. Judge Zenoff alerted the parties that she had presided over a felony case involving Vincent Holmes, a material witness in the case. In addition, Judge Zenoff disclosed that she handled some juvenile matters involving defendant. Judge Zenoff nevertheless believed that she could remain impartial. On July 2, 2002, defendant sought and received clarification

of Judge Zenoff's disclosures. Defendant stated that he was not willing to sign a remittal of disqualification. See 188 Ill. 2d R. 63(D). Judge Zenoff then recused herself from the case and set the matter for reassignment.

Chief Judge Grubb assigned the case to Judge Vidal. However, the State filed a motion for substitution of judge, which was granted. Chief Judge Grubb noted that the only remaining judges in the criminal division were himself, Judge Collins, and Judge McGraw. Chief Judge Grubb assigned the case to Judge Collins. When the parties appeared before her, Judge Collins informed them of several "potential conflicts" she had with the case. Defendant filed *instanter* a motion for substitution of judge, naming both Judge Collins and Chief Judge Grubb. See 725 ILCS 5/114—5(a) (West 2000). Judge Collins granted the motion, and the case was assigned to Judge McGraw.

Defendant then filed a motion for substitution of judge for cause against Judge McGraw. See 725 ILCS 5/114—5(d) (West 2000). In the motion, defendant alleged that Judge McGraw and Mark Karner, the assistant State's Attorney on the case, had a close personal and professional relationship. Defendant also alleged that Judge McGraw, while in private practice, granted an interview to a television journalist in which he deemed the State's decision to seek the death penalty against defendant as "very appropriate."[1] The motion for substitution of judge for cause was assigned to Judge Peterson. Judge McGraw filed an affidavit in response to defendant's motion. In the affidavit, dated July 24, 2002, Judge McGraw stated that 13 years earlier, he and Karner were colleagues in the State's Attorney's office and that the

---

[1]The full text of the news story, as reproduced in defendant's brief, provides:

> "NEWSCASTER: The Winnebago County State's Attorney's Office this morning announced that it will be seeking the death penalty in the case against the man accused of killing Police Detective Kevin Rice. After pleading not guilty to the charges, William Buck fainted in court this morning when he learned the State's Attorney's Office would be seeking his death if he is convicted. Buck was taken from the courtroom. His status hearing continued once he recovered.

> Local attorneys are paying close attention to this high profile case. One says seeking the death penalty for Buck is appropriate.

> MR. MCGRAW: It is very appropriate. Whenever a law enforcement officer's life is taken in the performance of his duties, I think it is the responsibility of the State's Attorney's Office to evaluate the facts, and if appropriate, based on the evidence that develops, to pursue the death penalty to stand with the law enforcement community against this type of crime."

two men have remained friends since. Judge McGraw stated that his relationship with Karner was not so close that he could not fairly rule on the issues in the case. With respect to the remarks to the media, Judge McGraw stated that his comments were not directed against defendant. Rather, their purpose was to explain the proper role of the State's Attorney in determining whether to seek the death penalty in certain types of cases. Judge McGraw averred that the statements were made in the abstract and not based on the merits of defendant's case.

At the hearing on the motion, defendant conceded that at the time that Judge McGraw spoke to the media, he was not seeking judicial office. Nevertheless, defendant suggested that Judge McGraw was campaigning for a seat on the bench, and defendant pointed out that Supreme Court Rule 67 (155 Ill. 2d R. 67) prohibits candidates from making statements that commit or appear to commit the candidate on issues that are likely to come before the court. Permitting Judge McGraw to remain on the case, defendant asserted, would reflect negatively on the judicial system. Judge Peterson took the matter under advisement.

On August 5, 2002, Judge Peterson denied defendant's motion for substitution of Judge McGraw for cause. Judge Peterson explained that mere friendship is not a basis for granting a motion for substitution of judge for cause. Judge Peterson opined that defendant's statement that Judge McGraw was running for election was "conclusory and without merit." With respect to the television report, Judge Peterson noted that the law allows the State to seek the death penalty under certain circumstances when a police officer is killed. Judge Peterson interpreted Judge McGraw's comments as "a statement of what the law allows." He noted that the legal and ethical duties of a State's Attorney are to evaluate the facts and, if appropriate, to pursue the death penalty under certain circumstances. Judge Peterson also explained that Judge McGraw did not offer an opinion about the evidence or facts of defendant's case and that his tone in delivering the statement was "calm[ ]" and "without rhetorical flurry." Thus, Judge Peterson concluded that there was no showing of actual prejudice or the appearance of impropriety.

At a hearing on September 9, 2002, Judge McGraw heard arguments on defendant's motion to bar death-penalty proceedings on the basis that the State would be unable to prove the existence of the statutory aggravating factor, i.e., that Rice was a police officer killed in the course of performing his official duties. Alternatively, defendant sought a pretrial evidentiary hearing on the matter. The State opposed defendant's motion, arguing that there was evidence that defendant

knew Rice's status as a police officer. The trial court ultimately denied defendant's requests, ruling that whether Rice was a police officer acting in the course of his official duties was a question of fact for the jury. On the same day, the court also denied a defense motion to preclude the prosecution from introducing evidence at trial that the deceased was a police officer. The court determined that the victim's status was relevant to motive.

On September 27, 2002, defendant filed a "Motion to Recuse." In his motion, defendant alleged that Judge McGraw was running for circuit judge in an election scheduled for November 5, 2002. Defendant further alleged that, on September 20, 2002, defense counsel became aware of billboards throughout Winnebago County "trumpeting the fact that Judge McGraw has been endorsed for election by the police associations of Rockford and Winnebago County, and contain[ing] representations of policemen in squad cars." Defendant alleged that since this case involves the death of a policeman and many police officers are expected to testify at defendant's trial, the billboards call into question Judge McGraw's ability to remain impartial. The motion also alleged that Assistant State's Attorney Karner was involved in Judge McGraw's election campaign, but that neither Karner nor Judge McGraw disclosed this fact. At the hearing on the motion, the State responded that although Karner did attend a "handful" of campaign meetings, he did not donate any money or actively campaign for Judge McGraw. Moreover, the State told the court that once Karner became aware that Judge McGraw would be assigned to defendant's case, his involvement in Judge McGraw's campaign was terminated and all communications he had with Judge McGraw were in open court. The State observed that judges in Illinois are elected and that campaigning is inevitable. Inherent in campaigning, the State maintained, is the use of billboards informing the public of any endorsements. The State claimed that there was nothing about the billboards that suggested that Judge McGraw could not be impartial. Judge McGraw denied the motion. He informed defendant that Karner's role in the election campaign ceased prior to the time that Judge McGraw was assigned to defendant's case. He also stated that his endorsement by the law-enforcement community "does not contain a corresponding promise or *quid pro quo* to ratify their conduct."

On October 4, 2002, defendant filed another "Motion for Substitution of Judge" pursuant to section 114—5(d). In the motion, defendant reiterated the points made in his previous motion for substitution and his motion to recuse. Following a hearing, Judge Timothy Gill, who was assigned to hear the motion, denied it.

The case proceeded to the guilt-innocence phase of the trial, after

which the jury returned a verdict of guilty of first-degree murder. At the death-eligibility phase, the State argued that defendant was eligible for the death penalty on the basis that he killed a person who was a peace officer acting in the course of performing his official duties and that defendant knew or should have known that the murdered individual was a peace officer. Following deliberations, the jury was unable to unanimously agree that defendant was eligible for a sentence of death. Defendant then filed various posttrial motions, which were denied. After a sentencing hearing, the trial court sentenced defendant to a term of 60 years' imprisonment. This appeal followed the denial of defendant's postsentencing motions.

## II. ANALYSIS

### A. Disqualification Issues

Defendant's first contentions of error revolve around his claim that Judge McGraw should have disqualified himself from presiding over defendant's trial. First, defendant cites a remark attributed to Judge McGraw, made prior to his election to the bench, informing the media that he considered the death penalty "very appropriate" for the type of crime with which defendant was charged. Second, defendant notes that the assistant State's Attorney who prosecuted defendant's case supported Judge McGraw's election campaign. Third, defendant points out that, during Judge McGraw's election campaign, billboards told voters that Judge McGraw had been endorsed by police associations. According to defendant, these revelations called into question Judge McGraw's ability to remain impartial and, under Supreme Court Rule 63(C)(1)(a) (188 Ill. 2d R. 63(C)(1)(a)), required Judge McGraw's disqualification.

Initially, the State argues that defendant should be estopped from raising this argument. The State correctly notes that pursuant to section 114—5(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/114—5(a) (West 2000)), defendant was entitled to the automatic substitution of up to two judges upon the timely filing of a proper written motion for substitution. *People v. Ryan*, 264 Ill. App. 3d 1, 3 (1994). The State asserts, however, that defendant "apparently felt that he would be able to seek the substitution of Judge McGraw for cause, thereby allowing him to substitute three judges, rather than the two allowed by statute." According to the State, defendant's "attempt to manipulate" the substitution process "represents a distortion of the statute." However, the State's position ignores a separate provision of the substitution-of-judge statute that allows a party to "move at any time for substitution of judge for cause." 725 ILCS 5/114—5(d) (West 2000). The purpose of section 114—5(d) is to "act[ ]

as a necessary fail-safe measure to preserve a defendant's right to a fair trial in situations where a defendant can show a judge's actual bias." *People v. Jones*, 197 Ill. 2d 346, 355 (2001). Section 114—5(d) applies "in addition to *** subsection[ ] (a)" (725 ILCS 5/114—5(d) (West 2000)), and it does not limit the number of motions for cause that a party may file (725 ILCS Ann. 5/114—5, Committee Comments—1963, at 607 (Smith-Hurd 1992) (referring to then subsection (c))). Thus, contrary to the State's position, defendant was entitled to the automatic substitution of up to two judges under section 114—5(a) as well as an unlimited number of motions for substitution of judge for cause under section 114—5(d).

■ Having rejected the State's estoppel theory, we turn to the merits of defendant's argument. In support of his argument, defendant cites Supreme Court Rule 63(C)(1)(a) (188 Ill. 2d R. 63(C)(1)(a)), also known as Canon 3 of the Illinois Code of Judicial Conduct. That rule provides in relevant part:

> "(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
>> (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]" 188 Ill. 2d R. 63(C)(1)(a).

This rule requires a judge to recuse himself when his participation might reasonably give rise to questions regarding his impartiality, including situations involving the appearance of impropriety. *People v. McLain*, 226 Ill. App. 3d 892, 902 (1992). For instance, our supreme court has recognized that a judge should recuse himself where he has knowledge outside the record concerning the truth or falsity of allegations, where the judge may be called as a material witness, or where the judge has a direct, personal, and substantial pecuniary interest in the litigation. *People v. Thompkins*, 181 Ill. 2d 1, 22 (1998). Defendant does not suggest that any of these circumstances are present in this case.

We noted in *McLain* that Rule 63(C)(1)(a) does not state or imply that the mere appearance of impropriety, by itself, is sufficient to find that a defendant is entitled to a new trial. *McLain*, 226 Ill. App. 3d at 902. Defendant asserts that the actual prejudice/appearance of impropriety distinction was rejected by the Supreme Court in *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 100 L. Ed. 2d 855, 108 S. Ct. 2194 (1988). In *Liljeberg*, the Supreme Court held that the trial court judge should have recused himself even though he did not have actual knowledge of the facts that gave rise to the appearance of impropriety. *Liljeberg*, 486 U.S. at 867-68, 100 L. Ed. 2d at

877, 108 S. Ct. at 2206. The Court concluded that the proper remedy was to vacate the judgment. *Liljeberg*, 486 U.S. at 868-70, 100 L. Ed. 2d at 877-78, 108 S. Ct. at 2207. The State asserts that *Liljeberg* is distinguishable in that *Liljeberg* interpreted the federal judicial recusal statute (28 U.S.C. § 455 (1988)). However, the language of Rule 63(C)(1)(a) is nearly identical to the language of the federal statute. Thus, for the purposes of our decision, we will assume that defendant's interpretation of *Liljeberg* is correct.

■ Nevertheless, we note that a defendant's right to substitution of judge for cause is not absolute. *People v. Wright*, 234 Ill. App. 3d 880, 897 (1992). A defendant has the burden of substantiating such prejudice on the part of the judge. *People v. Hayden*, 338 Ill. App. 3d 298, 309 (2003). Furthermore, recusal based on the appearance of impropriety under the federal statute assessed in *Liljeberg* requires the court to "assume that a reasonable person knows and understands all the relevant facts." (Emphasis omitted.) *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988); see also *Hook v. McDade*, 89 F.3d 350, 354 (7th Cir. 1996) (noting that federal disqualification statute requires inquiry as to whether a reasonable person perceives a significant risk that the judge will resolve the case on a basis other than the merits). The judge then assesses the appearance of impropriety, "not by considering what a straw poll of the only partly informed man-in-the-street would show—but by examining the record facts and the law, and then deciding whether a reasonable person knowing and understanding all the relevant facts would recuse the judge." *In re Drexel Burnham Lambert, Inc.*, 861 F.2d at 1313. Thus, our task is to assess whether a reasonable person, aware of the facts and the law, would believe that Judge McGraw was impartial. Assessed from this perspective, we conclude that defendant's claim that Judge McGraw was required to recuse himself based on the mere appearance of impropriety must fail.

■ Defendant first urges reversal on the basis of Judge McGraw's remarks to the media. We note initially that at the time that Judge McGraw made the comments, he was in private practice. More importantly, and contrary to defendant's contention, Judge McGraw's comments do not suggest that he believed that death was an appropriate sentence *for defendant*. Judge McGraw's comments were not directed at or against defendant. Rather, his comments were merely a general reflection on the State's Attorney's role in the determination of whether to seek the death penalty in certain types of cases. Illinois law permits the State to seek the death penalty under certain circumstances when a police officer is killed. See 720 ILCS 5/9—1(b) (West 2000). Judge McGraw, acknowledging the State's Attorney's

duty, remarked that it was "the responsibility of the State's Attorney's Office to evaluate the facts, and if appropriate, based on the evidence that develops, to pursue the death penalty." There is no evidence that the comment reflected Judge McGraw's personal belief that a sentence of death was required in this case. In an affidavit, Judge McGraw stated that the comments were made "in the abstract" and that they were "not based upon any of the merits specific to" defendant's case. Indeed, Judge McGraw did not mention defendant's name and he did not offer an opinion about the evidence or facts of defendant's case. Accordingly, in light of the facts and circumstances, we do not believe that a reasonable person would conclude based on the media interview that Judge McGraw was incapable of ruling fairly in defendant's case.

Defendant also asserts that Judge McGraw's friendship with attorney Karner, as well as Karner's role in Judge McGraw's election campaign, required Judge McGraw to disqualify himself from this case. It is generally held that a judge need not disqualify himself just because a friend appears before him in court. *McLain*, 226 Ill. App. 3d at 903; *Holloway v. United States*, 960 F.2d 1348, 1351 (8th Cir. 1992); *United States v. Murphy*, 768 F.2d 1518, 1537 (7th Cir. 1985); *Salt Lake Tribune Publishing Co. v. AT&T Corp.*, 353 F. Supp. 2d 1160, 1181 (D. Utah 2005). We note that most judges, if not all, practice for many years prior to joining the bench. During that time, they become acquainted with many of the attorneys and parties who may come before them. Defendant asserts, however, that this case is different because Assistant State's Attorney Karner actively supported Judge McGraw's election campaign. The evidence demonstrates, however, that at the time of defendant's trial, Karner was not involved in Judge McGraw's campaign. In an affidavit, Judge McGraw acknowledged that Karner, at one time, supported his election campaign. The record discloses that Karner attended a couple of meetings. However, Karner did not donate any money to Judge McGraw's campaign, Karner did not actively campaign for Judge McGraw, Karner terminated any involvement in Judge McGraw's campaign prior to the case being assigned to him, and all communications since then between Karner and Judge McGraw occurred in open court. One court has held that an attorney's support for a judge's nomination to the bench did not require the judge to disqualify himself from a case in which the attorney represented a party before the court. *Warner v. Global Natural Resources PLC*, 545 F. Supp. 1298, 1302 (S.D. Ohio 1982); see also *Baker v. City of Detroit*, 458 F. Supp. 374 (E.D. Mich. 1978). Thus, we do not find that defendant's claim of partiality is supported by the facts.

Finally, defendant asserts that Judge McGraw should have

disqualified himself because billboards for his election campaign informed voters that Judge McGraw had been endorsed by police associations. According to defendant, because the credibility of police officers was a major issue at trial in this case and because the billboards suggest "solidarity" between Judge McGraw and the police, Judge McGraw should have disqualified himself from presiding over defendant's trial. The problem with defendant's argument is that, if carried to its logical conclusion, it would require Judge McGraw's disqualification from all cases involving the police. Most if not all criminal cases involving factual issues also involve the credibility of witnesses, including law-enforcement officers. Judge McGraw would essentially be precluded from sitting in the criminal division of the court, as would any judge who had been endorsed by police personnel. We find this position untenable. Moreover, Judge McGraw averred that he has no bias in favor of or against law-enforcement officials and that the endorsements would not detract from his ability to discharge his duties with fairness and impartiality. Accordingly, considering the facts and circumstances, we do not believe that a reasonable person would conclude that Judge McGraw was incapable of ruling fairly in defendant's case.

## B. Death-Eligibility Issues

### 1. *Pretrial Eligibility Hearing*

Prior to trial, defendant filed a "Motion to Bar the Death Penalty as well as Capital Sentencing Proceedings due to the Governor's Moratorium." In support of his motion, defendant filed a memorandum in which he argued, among other things, that the trial court has the authority to hold a pretrial hearing to determine whether the State has a good-faith basis for seeking the death penalty. In the memorandum, defendant argued that requiring the State to justify its request "could result in considerable savings of time and expense." The State responded that the procedure espoused by defendant would "invade the province of the jury." Following oral arguments on the motion, the trial court denied defendant's request for a pretrial hearing, concluding that the issue of whether Rice was a peace officer killed in the course of performing his official duties was a fact question "properly reserved for the jury."

Defendant now appeals the trial court's ruling rejecting his request for a pretrial hearing to determine whether he was eligible for the death penalty based on Rice's status as a police officer. Defendant claims that the evidence at the hearing would have shown that the State could not prove beyond a reasonable doubt that defendant knew or should have known that Rice was a police officer or that Rice was

performing his official duties. This pretrial determination was critical, defendant insists, because, if decided in his favor, the jury would have been shielded from learning that Rice was a police officer. According to defendant, the trial court's denial of the request resulted in his "right to a fair trial [being] corrupted by evidence which was only relevant to the death penalty."

■ At the outset, the State argues that defendant waived consideration of this issue because the reason he now proffers for holding such a hearing differs from the reasons he argued in the trial court. After reviewing defendant's arguments before the trial court, however, we cannot say that they are so fundamentally different as to foreclose our resolution of this issue. The heart of defendant's argument on appeal, that the State could not prove the aggravating factor beyond a reasonable doubt, was raised at various points throughout the trial proceedings. Accordingly, we reject the State's waiver argument. On the merits, the State argues that defendant is not entitled under Illinois law to a pretrial hearing on his eligibility for the death penalty. In any event, the State asserts, defendant was, in essence, afforded such a hearing as is evident from the trial court's comments in denying his motion.

Our research has revealed only one Illinois case addressing whether a defendant is entitled to a pretrial hearing to assess the factors asserted for his death eligibility. In *People v. Creque*, 214 Ill. App. 3d 587 (1991), the defendant was convicted of one count of aggravated arson and three counts of felony murder. Following a sentencing hearing, the trial court found the defendant ineligible for the death penalty, and the defendant was sentenced to a term of natural life imprisonment. On appeal, the defendant argued, among other things, that the trial court should have held a preliminary hearing before trial to determine whether death would be appropriate if he were found guilty. At the time that *Creque* was decided, Illinois law did not require the State to decide whether to seek the death penalty until after the guilt-innocence phase was completed. See, *e.g.*, *People v. Silagy*, 101 Ill. 2d 147, 161-62 (1984). The *Creque* court relied on this factor in rejecting the defendant's argument. *Creque*, 214 Ill. App. 3d at 593. We note that Illinois now requires the prosecutor to disclose prior to trial his or her intention to seek the death penalty. 188 Ill. 2d R. 416(c).

However, the *Creque* court also cited two other factors in support of its holding. First, the court noted that neither statutory nor case law requires a pretrial death-eligibility hearing. *Creque*, 214 Ill. App. 3d at 593. As the *Creque* court pointed out, the statute that outlines the procedure used in death-penalty cases "unambiguously contemplates a separate sentencing hearing only after defendant is convicted

or pleads guilty." *Creque*, 214 Ill. App. 3d at 593. Second, the *Creque* court characterized the procedure espoused by the defendant as "inefficient and impractical." *Creque*, 214 Ill. App. 3d at 593. Despite the close scrutiny that capital cases have recently received in this state, Illinois law has not been changed to require a pretrial death-eligibility hearing.

Courts in other states, however, have approved pretrial review of the factual basis of the aggravating factors used to establish death-eligibility. The rationale for such review is to "preserve judicial and administrative resources." *State v. McCrary*, 97 N.J. 132, 141, 478 A.2d 339, 344 (1984); see also *State v. Ogden*, 118 N.M. 234, 239, 880 P.2d 845, 850 (1994) (noting that such a procedure will "conserve judicial resources and ensure fairer trials for capital defendants"); *State v. Watson*, 310 N.C. 384, 388, 312 S.E.2d 448, 452 (1984) (commending for its judicial economy and administrative efficiency a pretrial procedure for assessing whether sufficient evidence supported death-eligibility factor). The procedure approved by these courts does not require the prosecutor to prove the existence of the aggravating factor. Rather, the purpose of the procedure is to "assure that there is some evidence that justifies the submission of the specified aggravating factors to the trier of fact at the sentencing phase of the case." *McCrary*, 97 N.J. at 143, 478 A.2d at 345; see also *State v. Matulewicz*, 115 N.J. 191, 196, 557 A.2d 1001, 1004 (1989) ("the procedure [adopted in *McCrary*] does not require the prosecutor to prove his case before trial"); *Ogden*, 118 N.M. at 240, 880 P.3d at 851 (noting that when the applicability of an aggravating factor raises a question of fact or a mixed question of fact and law, a defendant's motion to dismiss the aggravating factor should be granted only when the court finds the lack of probable cause to support the aggravating factor). The procedure imposed involves a summary review of the evidence upon which the prosecutor relied in charging the aggravating factor. *McCrary*, 97 N.J. at 143, 478 A.2d at 345; *Ogden*, 118 N.M. at 240, 880 P.2d at 851. Only in limited circumstances will testimony be allowed. *McCrary*, 97 N.J. at 143, 478 A.2d at 345; *Ogden*, 118 N.M. at 240, 880 P.2d at 851.

■ We need not pass upon the continuing vitality of the *Creque* decision, for we agree with the State that defendant effectively received the hearing he requested. After defendant filed his motion and accompanying memorandum, the trial court held a hearing on the motion. Defense counsel extensively argued at the hearing his contention that the State would be unable to prove the aggravating factor at issue, *i.e.*, whether Rice was "a peace officer *** killed in the course of performing his official duties *** and defendant knew or should have

known that the murdered individual was a peace officer." Defense counsel presented evidence that, he suggested, refuted a finding that Rice was in the course of performing his official duties at the time of the shooting. In addition, defense counsel reviewed the evidence regarding whether defendant knew Rice to be a peace officer and argued that it was weak. The State responded that there is no Illinois law requiring the court to hold a hearing to address the question of whether the State could prove the eligibility factor at issue. Moreover, the State asserted, there is ample evidence to support the eligibility factor. Ultimately, the trial court denied the motion, stating:

> "And I think in the course of the motions we've heard in this case, about the potential testimony of [certain witnesses], that the Court finds, at least at this stage, that it is not impossible or beyond the realm of possibility for a reasonable jury, after having heard all the evidence and drawn all the relevant inferences from the evidence, it's not, I should—should phrase it in the affirmative; they could find that Kevin Rice was a peace officer engaged in the course and performance of his official duties. ***
>
> I disagree that there'll be no evidence that Officer Rice was killed in the course of performing his official duties, I think that is a fact question. The alternative would be to waive jury trial and to ask the Court to, as the finder-of-fact to make that determination, but there's a jury demand."

This hearing was consistent with the type of hearing sanctioned by courts in those jurisdictions that conduct a pretrial assessment of death-eligibility factors. The hearing consisted of a summary review of the evidence upon which the State relied in charging the death-eligibility factor. Defendant presented to the court his theory that the State would be unable to prove that Rice was a police officer engaged in his official duties and that defendant knew or should have known of Rice's status. The trial court ultimately rejected defendant's argument. However, the trial court did effectively grant defendant's request for a pretrial hearing on the matter. Thus, defendant received a ruling on its merits.

### 2. Guilt-Innocence Phase

Prior to trial, defendant filed a motion *in limine* to bar the State from presenting evidence at the guilt-innocence phase of the trial that Rice was a police officer. The trial court denied defendant's request on the basis that Rice's status as a police officer was relevant to motive to commit the crime. Defendant now argues that the trial court's ruling was incorrect. Defendant claims that Rice's status as a police officer was irrelevant and that informing the jury of such impaired his right to a fair trial.

■ Initially, the State asserts that defendant waived this argument because he himself referenced Rice's status as a police officer "for some of [his] most compelling arguments." It is true that, as a general rule, a party cannot object on appeal to evidence that the party introduced (*People v. Williams*, 161 Ill. 2d 1, 34 (1994)) and that defense counsel referenced Rice's status as a police officer throughout the trial. However, the aforementioned waiver rule does not apply where, as here, a motion to exclude the evidence was presented and denied. *Williams*, 161 Ill. 2d at 34.

We will not disturb the trial court's ruling on a motion *in limine* absent an abuse of discretion. *People v. Harvey*, 211 Ill. 2d 368, 392 (2004). Relevant evidence is evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence. *Harvey*, 211 Ill. 2d at 392. Furthermore, we note that while the prosecution is not obligated to prove motive, the State may introduce evidence that tends to show that an accused has a motive for killing the deceased. *People v. James*, 348 Ill. App. 3d 498, 509 (2004). "Any evidence which tends to show that an accused had a motive for killing the deceased is relevant because it renders more probable that the accused did kill the deceased." *James*, 348 Ill. App. 3d at 509. In order for evidence of a motive to be competent, it must, "at least to a slight degree, tend to establish the existence of the motive relied upon or alleged." *People v. Smith*, 141 Ill. 2d 40, 56 (1990).

■ In this case, the State asserts that the motive for the shooting was defendant's belief that Rice was a police officer. The evidence supports this theory. The State elicited testimony that prior to the shooting, defendant and an acquaintance met up "supposedly [to go] on a robbery" when Rice saw them. Rice, in his vehicle, approached defendant and his acquaintance, rolled down the window, and asked the two, "What are you all doing in this neighborhood?" At that point, defendant purportedly told his acquaintance, in reference to Rice, "I think it's the police." During his custodial interrogation, he told police that he "figured" that the individual in the vehicle was an officer. In addition, after the shooting, defendant purportedly told the acquaintance, "Man, I shot a cop." Based on this evidence, the trial court did not abuse its discretion in denying defendant's motion *in limine* to preclude the State from introducing evidence of Rice's status as a police officer. We agree with the trial court that evidence of Rice's status was relevant to show motive. Specifically, the evidence shows that defendant and his acquaintance were planning to commit a crime when they were approached by an individual whom defendant believed to be a law-enforcement officer. The State suggests that defendant

shot at Rice in order to thwart the latter's investigation into defendant's activities. In other words, Rice's status as a police officer explains why defendant committed the shooting. Since evidence regarding Rice's status as a police officer, "at least to a slight degree, tend[s] to establish the existence of the motive relied upon or alleged," the evidence was competent. Moreover, the evidence was relevant because it makes it more likely that defendant shot Rice.

Nevertheless, defendant, citing to *In re B.C.*, 176 Ill. 2d 536 (1997), asserts that his belief that Rice was a police officer does not make the factuality of that belief relevant. *B.C.* addressed a question of statutory construction involving the hate crime statute (720 ILCS 5/12— 7.1(a) (West 1994)). There, the supreme court held that the hate crime statute does not require that the victim of the offense be a member of the group whose protected class provided the reason for the offense. *B.C.*, 176 Ill. 2d at 538. Rather, the court ruled, it is the "improper bias which motivates certain criminal acts \*\*\* which elevates the conduct to the level of hate crime, rather than merely the status of a particular victim." *B.C.*, 176 Ill. 2d at 551. This holding has never been applied outside the realm of the hate crime statute. Thus, we fail to see the relevance of *B.C.* to the instant case. In any event, Rice's actual status as a police officer was relevant because it makes defendant's belief more probable.

Defendant also argues that *People v. Blue*, 189 Ill. 2d 99 (2000), and *People v. March*, 95 Ill. App. 3d 46 (1981), preclude the introduction at the guilt-innocence phase of a trial of the victim's status as a police officer. We disagree.

In *Blue*, the defendant was accused of multiple crimes, including the shooting death of a police officer. On appeal, the defendant argued, among other things, that the trial court abused its discretion in failing to sustain his objection to the State's remark urging the jury to convict the defendant in order to send a message to all police that the jury supported them. The supreme court described the State's comment as "a transparent play to the jury's sympathy and loyalty to law enforcement." *Blue*, 189 Ill. 2d at 132. The court further stated that nothing in the State's remark "tended to make the \*\*\* defendant's guilt more or less true." *Blue*, 189 Ill. 2d at 132. This error, the court concluded, was compounded by the prosecution's presentation of testimony from a police commander that the decedent was a police officer and the police commander's reading of the decedent's oath of office. *Blue*, 189 Ill. 2d at 133. At trial, the State argued that the police commander's testimony was relevant to show that the decedent was killed in the line of duty. The supreme court responded, "the fact [that the decedent] was killed in the line of duty was relevant only at the eligibil-

ity phase of [the] defendant's subsequent capital sentencing hearing [citation]. *The fact that [the decedent] was a police officer was, at the guilt phase of the trial, irrelevant to the central issue of [the] defendant's guilt or innocence."* (Emphasis added.) *Blue,* 189 Ill. 2d at 133-34. The court concluded that the admission of this evidence, combined with the introduction of the decedent's blood- and brain-splattered uniform, the argument that the jury needed to send a message to the decedent's family, the testimony that the decedent's police star occupies an honored place at police headquarters, and the prosecutor's tendency to interject editorializing objections, deprived the defendant of a fair trial. *Blue,* 189 Ill. 2d at 139-40.

In *March,* the defendant was convicted of killing an off-duty sheriff's deputy. The trial court denied the defendant's motion *in limine* to bar the State from referencing the victim's status as a law-enforcement officer. On appeal, the defendant challenged the trial court's ruling. The appellate court determined that evidence of a victim's status as a law-enforcement officer is inadmissible unless this fact tends to prove a fact in controversy or renders a matter in issue more or less probable. *March,* 95 Ill. App. 3d at 56. The trial court did not indicate that such evidence is never admissible. However, having found reversible error for other reasons, the court cautioned that such evidence should not be admitted on remand "unless its relevancy is more clearly established by the State than was done in this proceeding." *March,* 95 Ill. App. 3d at 56.

Neither *Blue* nor *March* stands for the proposition that, standing alone, the fact that a jury is exposed to a victim's involvement in law enforcement constitutes reversible error. In *Blue,* the prosecution's reference to the victim's status was one of many errors, the cumulative effect of which, the supreme court determined, deprived the defendant of a fair trial. *Blue,* 189 Ill. 2d at 104, 120. Admittedly, the *Blue* court did state that evidence of the victim's status as a police officer was irrelevant at the guilt-innocence phase of the trial. However, the supreme court did not hold that a victim's status in the law-enforcement community would never be relevant at the guilt-innocence phase of a capital trial. Moreover, in *Blue,* it appears that the evidence of the victim's status was presented only to show that the decedent was a police officer. In the present case, the evidence of the victim's status was relevant to motive. Indeed, the *March* court indicated that evidence of a victim's status would be admissible if relevant. *March,* 95 Ill. App. 3d at 56. Accordingly, we reject defendant's request for reversal of his conviction on the basis that the admission of Rice's status as a police officer was irrelevant at the guilt-innocence phase of the trial.

## C. Instructions Issue

Next, defendant argues that the trial court erred in refusing to tender to the jury two of his proposed instructions. At trial, the State presented testimony that, during a police interrogation, defendant confessed to shooting Rice. The confession was not electronically recorded. During the instruction conference, defendant tendered two proposed instructions relating to the circumstances under which the confession was made and the reliability of electronically recorded confessions. Defendant's proposed instruction No. 24 read:

"You have before you evidence that the defendant made statements relating to the offenses charged in the indictment. It is for you to determine whether the defendant made the statements, and, if so, what weight should be given the statements. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made. You should pay particular attention to whether or not the statement is recorded, and if it is, what method was used to record it. Generally, an electronic recording that contains the defendant's actual voice or a statement written by the defendant is more reliable than a non-recorded summary."

Defendant's instruction No. 24 is a combination of Illinois Pattern Jury Instructions, Criminal, No. 3.06—3.07 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 3.06—3.07) and recommendation 58 of the Report of the Governor's Commission on Capital Punishment (Report of the Governor's Commission on Capital Punishment, ch. 9, at 133-34 (April 2002)). Defendant's proposed instruction No. 26 provided:

"You have before you evidence that the defendant made statements relating to the offenses charged in the indictment. It is for you to determine whether the defendant made the statements, and, if so, what weight should be given the statements. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made. Circumstances which you may consider include, but are not limited to: (1) whether the defendant was in police custody at the time the statement was made, (2) the place where it is alleged the statement is made, (3) the length of time the defendant was in police custody before the statement was made, (4) the number of interrogations the defendant underwent, (5) whether the alleged statement contains the defendant's own words, (6) whether all or part of the interrogation process was videotaped or audio taped, and (7) the age, education, and physical and mental condition of the defendant."

Defendant's instruction No. 26 is based on IPI Criminal 4th No. 3.06—3.07 and *Crane v. Kentucky*, 476 U.S. 683, 691, 90 L. Ed. 2d 636, 645, 106 S. Ct. 2142, 2147 (1986) (noting that evidence about the manner

in which a confession was obtained is highly relevant to its reliability and credibility). The trial court refused to tender these two proposed instructions to the jury. Instead, the court gave the jury the unmodified version of IPI Criminal 4th No. 3.06—3.07.[2]

Defendant argues that the trial court erred in refusing to tender these two proposed instructions to the jury. Defendant notes that the Illinois General Assembly recently passed legislation providing that an oral or written statement made by an accused during a custodial interrogation is presumed to be inadmissible as evidence against the accused in a homicide proceeding unless an electronic recording is made of the interrogation. 725 ILCS 5/103—2.1(b) (West 2004); see also Report of the Governor's Commission on Capital Punishment, ch. 2, at 24-28 (April 2002) (recommending that custodial interrogations in police facilities should be videotaped in their entirety). Defendant concedes that section 103—2.1(b) of the Code of Criminal Procedure did not take effect until July 18, 2005, almost four years after he was interrogated by the police. Nevertheless, defendant contends that, in light of the "pitfalls of reliance upon unreliable station-house confessions" and the "commonality of purpose shared by *** section [103—2.1(b)] and [his] proffered instruction [sic]," the trial court abused its discretion in refusing to provide the jury with some form of these modified instructions. The State counters that the trial court gave the jury the only instruction required by law, i.e., the unmodified version of IPI Criminal 4th No. 3.06—3.07.

Illinois courts give preference to applicable pattern jury instructions over nonpattern instructions. People v. Larson, 82 Ill. App. 3d 129, 141 (1980). Indeed, Supreme Court Rule 451(a) informs that whenever the Illinois Pattern Jury Instructions, Criminal, contain an instruction applicable in a criminal case and the court determines that the jury should be instructed on the subject, the applicable pattern jury instruction "shall be used" unless it does not accurately state the law. 177 Ill. 2d R. 451(a). Nevertheless, if the pattern jury instructions do not contain an instruction on a subject on which the trial court determines that the jury should be instructed, the court may tender a nonpattern instruction to the jury as long as it is simple, brief, impartial, and free from argument. 177 Ill. 2d R. 451(a); People v. Walker, 227 Ill. App. 3d 102, 105 (1992). It is within the trial court's discretion whether to give a non-IPI instruction. People v. Tsombanidis, 235 Ill. App. 3d 823, 838 (1992). A trial court does not exceed its discretion by refusing to give a non-IPI instruction if there is an ap-

---

[2]IPI Criminal 4th No. 3.06—3.07 consists of the first three sentences of defendant's proposed instructions Nos. 24 and 26.

plicable IPI instruction or the essence of the refused instruction is covered by other instructions. *Tsombanidis*, 235 Ill. App. 3d at 838.

■ We conclude that the trial court did not abuse its discretion in refusing defendant's tendered instructions, as the essence of the refused instructions is covered by IPI Criminal 4th No. 3.06—3.07. Throughout the trial, defense counsel emphasized that defendant's interrogation was not electronically recorded. During his opening statement, defense counsel told the jury:

> "One question you're gonna [*sic*] have to ask yourself is *** how many minutes of [defendant's interrogation] were videotaped? What kind of—how many minutes were audio taped? What kind of record was made of this crucial part of the investigation? And there's a very simple answer. The answer is none. Not one minute recorded by videotape or audio tape."

At trial, defense counsel elicited testimony from Officer Stephen Pirages that defendant's interrogation was not electronically recorded. During closing argument, defense counsel told the jury that he would discuss "videotaping and lack of videotaping." Defense counsel later stated in relevant part:

> "When the police have, under modern technology, the means to accurately record the statements of the principal in their view, suspect in the case, and they don't record it, you can reasonably infer that a videotape would not have helped them, it would have hurt them. And if it would have helped them, they would have videotaped.
>
> * * *
>
> If you were to rank statements based upon just their form, in terms of reliability, obviously a videotaped statement or a court reporter, where you can actually get the questions and answers, is at the top. A written statement is some sort of summary that the—a written statement of the defendant, in his own hand, saying what he wants to say, may be next. A written statement prepared by the police, which they put in their words and get the defendant to sign a little further down there. An oral statement, where all you have to go on is [Officer] Pirages' [*sic*] recollection of what he claims was said. That's at the bottom. That's the bottom of the heap, in terms of reliable evidence.
>
> Now, we had some discussion of videotaping and why it is important and why it should have been done in this case. In this case it was crucial. It was absolutely crucial, because we can't know exactly what happened during that interrogation, what was said, what the answers were, if any, what responses, how the whole thing came to be.
>
> * * *

In any event, there's a lot of information that a videotape would have provided, just common sense: Tone of voice, exact form of questions, exact form of answers, whether both people were talking, whether they were shouting, yelling, who knows. But you can't get all that information if you don't record it.

In this particular case—by the way, there is a very simple way to take the videotape. All they have to do, all Pirages had to do was go to the jail cell where [defendant] was under observation and interview him there, and then it would have all been on videotape, preserved at least for 30 days. He chose not to do that. And because he chose not to do that, you are entitled to view with skepticism what he claims was said."

The version of IPI Criminal 4th No. 3.06—3.07 given in this case directed the jury to "determine whether the defendant made the statements, and, if so, what weight should be given to the statements." As noted above, defense counsel repeatedly informed the jury that defendant's statement was not electronically recorded. The instruction tendered to the jury did not prohibit the jury from considering this fact in assessing the weight to be given his statement. Indeed, as argued by defense counsel, the failure of the police to videotape defendant's statement gave rise to the inference that the statement was not made at all. Thus, the instruction as given placed the reliability of defendant's statement squarely before the jury.

Moreover, IPI Criminal 4th No. 3.06—3.07 informs the jury that, in determining the weight to be given to the statement, it should consider "all of the circumstances under which [the statement] was made." IPI Criminal 4th No. 3.06—3.07. The trial court was not required to emphasize one circumstance under which the statement was made over other relevant circumstances. See IPI Criminal 4th No. 3.00, Introduction (noting, with certain exceptions, the disapproval of instructions that unduly emphasize particular types of evidence in a case and that courts are not required to give an instruction that would provide the jury with no more guidance than that available to it by application of common sense). Defendant disputes that the method by which a confession is recorded constitutes one of the "circumstances" by which it is made. However, the term "circumstance" has been defined as "a specific part, phase, or attribute of the surroundings or background of an event, fact, or thing or the prevailing conditions in which it exists or takes place." Webster's Third New International Dictionary 410 (2002). Under this definition, the method in which a confession is memorialized is an "attribute of the surroundings or background of an event." Accordingly, we conclude that the method by which a confession is made clearly falls within the purview of IPI

Criminal 4th No. 3.06—3.07. See *People v. Richmond*, 341 Ill. App. 3d 39, 55-56 (2003) (Hoffman, J., specially concurring) (concluding that whether the defendant's statement was videotaped is a circumstance that the jury should consider in determining the weight to be given the statement).

Defendant's argument relies on section 103—2.1(b) of the Code of Criminal Procedure (725 ILCS 5/103—2.1(b) (West 2004)), which creates a presumption that an oral statement is inadmissible, and recommendation 58 of the Report of the Governor's Commission on Capital Punishment (Report of the Governor's Commission on Capital Punishment, ch. 9, at 133-34 (April 2002)), which recommends the addition to IPI Criminal 4th No. 3.06—3.07 of language regarding the reliability of electronically recorded confessions. Defendant argues that in light of these authorities, "the *status quo* is no longer acceptable" and "the method of recording the statement is now legally recognized as potentially *determinative* of the statement's admissibility." (Emphasis in original.) However, as defendant concedes, the legislature opted not to make section 103—2.1 effective until July 18, 2005. See Pub. Act 93—206, eff. July 18, 2005 (adding 725 ILCS 5/103—2.1). In other words, the legislature did not intend to effect an immediate change. Moreover, the report of the Governor's Commission on Capital Punishment was issued in April 2002. More than three years have passed and recommendation 58 has yet to be adopted by the Illinois Supreme Court Committee on Pattern Jury Instructions in Criminal Cases.

In addition, defendant claims to find support for his position in *People v. Gonzalez*, 326 Ill. App. 3d 629 (2001). In *Gonzalez*, however, the jury was given an instruction that misstated the law. *Gonzalez*, 326 Ill. App. 3d at 639. In this case, there is no evidence that the jury was misinstructed. To the contrary, the jury was given an unmodified version of IPI Criminal 4th No. 3.06—3.07. Thus, defendant's reliance on *Gonzalez* is misplaced.

Finally, defendant notes that Alaska and Minnesota require police to electronically record custodial interrogations (see, *e.g.*, *Stephan v. State*, 711 P.2d 1156 (Alaska 1985); *State v. Scales*, 518 N.W.2d 587 (Minn. 1994)) and that the Massachusetts Supreme Court recently held that juries should be instructed on the legal significance of the failure of the authorities to electronically record custodial interrogations if so requested by the defendant (*Commonwealth v. DiGiambattista*, 442 Mass. 423, 447-48, 813 N.E.2d 516, 533-34 (2004)). The fact that Alaska and Minnesota require police to electronically record custodial interrogations says nothing about whether the jury must be *instructed* regarding the reliability of electronically recorded confes-

sions.[3] Moreover, even if we were to adopt a holding similar to the one espoused in *DiGiambattista*, we fail to see how such a rule would help defendant. In *Commonwealth v. Dagley*, 442 Mass. 713, 721-22, 816 N.E.2d 527, 533-34 (2004), the court concluded that the holding in *DiGiambattista* did not announce a new constitutional rule. As a result, the *Dagley* court held that it would apply only to trials occurring after the issuance of the *DiGiambattista* decision. *Dagley*, 442 Mass. at 722, 816 N.E.2d at 534. Thus, even if we agreed with defendant that a jury should be instructed in accordance with recommendation 58 of the Report of the Governor's Commission on Capital Punishment, such a holding would be prospective only and would not aid defendant. In addition, the fact that only Massachusetts requires a jury to be instructed regarding the reliability of electronically recorded statements means that the 49 remaining states have yet to adopt such a requirement. As the State points out, the adoption of this requirement by one state hardly reflects an overwhelming trend.

## III. CONCLUSION

For the reasons set forth above, we affirm the judgment of the circuit court of Winnebago County.

Affirmed.

O'MALLEY, P.J., and CALLUM, J., concur.

---

[3]Our research reveals that at least one other state and the District of Columbia currently require the electronic recording of certain custodial interrogations. Tex. Code Crim. Proc. Ann. art. 38.22(3) (Vernon 2005) (oral and sign language statements); D.C. Code Ann. § 5—116.01 (Supp. 2005) (crimes of violence). In addition, the legislature of New Mexico has passed similar legislation, which is scheduled to take effect on January 1, 2006. N.M. Stat. Ann. § 29—14—4.5 (Michie 2005) (effective January 1, 2006).