COMMONWEALTH *VS.* STEPHEN DAGLEY.

Essex. September 10, 2004. - October 26, 2004.

Present: MARSHALL, C.J., IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Evidence,* Admissions and confessions. *Constitutional Law,* Admissions and confessions. *Arrest. Telephone. Practice, Criminal,* Argument by prosecutor, Capital case. *Homicide.*

A criminal defendant failed to demonstrate that police violated his statutory right to make a telephone call under G. L. c. 276, § 33A, where the defendant was in fact advised of his right to make a telephone call after his formal arrest, but not during his prearrest interrogation. [719-720]

This court declined to give retroactive effect to its holding in *Commonwealth* v. *DiGiambattista, ante* 423, 441-442, 445 (2004), to allow a criminal defendant a new trial in order to obtain the benefit of a jury instruction on the significance of the failure of the police to preserve his custodial interrogation by means of electronic recording. [720-722]

At a murder trial, the prosecutor's fleeting reference, during closing argument, to the concept of a "reasonable response" to provocation, although erroneous, could not have affected the jury's understanding of the distinction between manslaughter and murder, in light of the argument as a whole, the judge's comprehensive oral and written instructions on the subject, and the judge's repeated admonitions that the jurors should accept the legal definitions provided by the judge. [722-726]

No reason appeared on the record of a murder trial for this court to exercise its power under G. L. c. 278, § 33E, to reduce the verdict to a lesser degree of guilt. [726-727]

INDICTMENT found and returned in the Superior Court Department on September 13, 2000.

A pretrial motion to suppress evidence was heard by *Richard E. Welch, III*, J., and the case was tried before *Peter W. Agnes, Jr.*, J.

*Brownlow M. Speer*, Committee for Public Counsel Services, for the defendant.

*Gregory I. Massing*, Assistant District Attorney, for the Commonwealth.

SOSMAN, J. The defendant was convicted of murder in the first

degree, on grounds of extreme atrocity or cruelty, stemming from the beating death of his girl friend.[1] At trial, the defendant admitted that he had killed the victim, but contended that the homicide was a manslaughter, not any form of murder. On appeal, he argues that (1) his statement to the police should have been suppressed for violation of his statutory right to make a telephone call (G. L. c. 276, § 33A) and for failure to make an electronic recording of the interrogation, and (2) that the prosecutor's closing argument contained an erroneous state-ment of law with respect to the reasonable provocation that would reduce murder to manslaughter. He also asks that we exercise our power under G. L. c. 278, § 33E, to reduce the conviction to murder in the second degree. For the following reasons, we affirm the conviction and decline to grant relief under G. L. c. 278, § 33E.

1. *Facts.* We summarize the facts, viewed in the light most favorable to the Commonwealth. The defendant met the victim in June, 2000, and moved into her fourth-floor apartment on Essex Street in Salem approximately one week later. The defendant was an alcoholic, and the victim was a heroin addict who had begun receiving treatment at a methadone clinic. Over the weeks following the defendant's moving into the victim's apartment, their relationship deteriorated. A downstairs neighbor observed the defendant's verbal and physical abuse of the victim on multiple occasions during the weeks prior to the victim's death. Both the neighbor and another witness, a friend of the victim, testified to the defendant's possessive behavior toward the victim, to constant arguments between them, and to the victim's cowering in fear when the defendant became "intimi-dating" and "overbearing" during those arguments.

At approximately 10:15 P.M. on August 21, 2000, the downstairs neighbor came home to his apartment and observed the defendant and the victim arguing outside in front of the building. The two proceeded up the stairs, still arguing, and the neighbor overheard the victim telling the defendant that she was moving to an apartment on a different floor and that the defendant would have to move out. Thereafter, the neighbor

---

[1]The jury rejected the Commonwealth's alternate theory of murder in the first degree by way of deliberate premeditation.

heard more yelling and screaming coming from the apartment above him, and then heard banging on the floor. The voices stopped, but the banging — like a "hammer hitting the floor" — continued periodically. There would be a period of silence, followed by several banging sounds, then another period of silence, followed by more banging. The force of the banging was such that a ceiling tile in the neighbor's apartment dropped, and some plaster loosened and fell. The neighbor contacted the building owner to complain of the disturbance, and then telephoned the police. The police arrived within minutes, and the sound of banging ceased just after the cruiser's blue lights appeared. The neighbor's estimate was that the period during which he had heard yelling and screaming along with banging sounds from the apartment above had lasted approximately twenty to twenty-five minutes, and that the intermittent banging sound had continued thereafter for about another ten minutes. He also estimated that he had heard a total of approximately thirty-five separate banging sounds over the entire course of events, with eight to fifteen of those coming after the sound of voices had ceased.

On their arrival, the police knocked on the victim's apartment door, announced their presence, and asked to be let in. When there was no response, they radioed for advice as to whether they had grounds to kick in the door. After a brief period of time, they received authorization to proceed, and they forcibly entered the apartment. The victim was lying unconscious on the floor with a large pool of blood around her head. There was obvious and extensive injury to her head and face. Emergency medical personnel were summoned, but efforts to revive the victim were unsuccessful, and she was pronounced dead at a hospital a short time later.

Inspection of the scene revealed bloody footprints (later matched with the soles of the defendant's shoes) headed in the direction of a window. The window screen appeared to have been kicked out, with the perpetrator escaping out over the roof. Police interviewed the downstairs neighbor, obtained the defendant's name, and alerted patrols that they were looking for the defendant.

At approximately 1 A.M., the defendant arrived at the home of

his former girl friend in Beverly, telling her that he had been in a fight, that someone was after him, and that he needed a place to stay. She noticed that he had a "stale alcohol smell" about him, but, in her opinion, he was not under the influence of alcohol at the time. While they were out on the porch, a Beverly officer drove by, spotted the defendant, and contacted the Salem police. The officer told the defendant that the Salem police wanted to talk to him. The defendant replied that he had been in Beverly all night. He also related that he was in pain, because someone had hit him with a baseball bat.

The officers from Salem arrived, along with State Trooper Pi Downsbrough. They asked the defendant to accompany them to the Salem police station. He agreed, stood up, and put out his hands as if he were about to be handcuffed. The officers told him he was not under arrest, and he proceeded, without restraints, to the cruiser. En route to the station, the defendant again complained that he was in pain, explaining that he had been "jumped by people" that night.

At the station, the defendant was read the Miranda warnings, which he acknowledged in writing at around 1:55 A.M. The defendant proceeded to give several different versions of the night's events. At first, he claimed that the victim had asked him to move out when she had gone to her new job that afternoon, that he had packed his things and left her a note in the apartment, and had proceeded to Beverly. He recounted that a group of young people had confronted him in a parking lot, and that someone had later accosted him and struck him with a baseball bat. He claimed that the blood on his hands (which was plainly visible) came "from whacking the dude."[2] The defendant then changed his story, acknowledging that he had gone back to the apartment to try to make up with the victim, and that they had a brief fight during which he "pushed her away" but did not hit her. The next version was that the victim had pulled a knife on him. After noting that, if someone pulled a knife on him, "[they're] going down," the defendant admitted that he had pushed the victim down and "smacked her" twice in the head. He had succeeded in knocking the knife out of her

---

[2]Deoxyribonucleic acid (DNA) testing was later performed on the blood on the defendant's hands, and the defendant stipulated at trial that it was the victim's blood.

hand, and he told the police that the knife was still in the apartment. He then acknowledged that he had "hurt her bad," explaining that he did not know his own strength, and that when he hits someone, "they split open." He then stated that he "lost control," that the victim was punching and kicking him, that he delivered two quick punches that knocked the victim down, and that he punched and slapped her one more time after she was down. The victim was on the floor with her hands over her face, "just groaning." He admitted to a total of three blows to her face. When he heard the police arrive, he left through the window and over the roof.[3] He had decided to escape on foot rather than use his car, for fear that the vehicle's broken muffler would make too much noise and attract attention. After making his confession, the defendant clarified that although he had been confronted by some young people in a parking lot earlier that day, no one had confronted him later or hit him with a bat.

The interview lasted approximately two hours, including a five-minute break for a cigarette and use of the bathroom at around 3:15 A.M. Trooper Downsbrough had kept notes during the interview, attempting to take down the defendant's own words verbatim. At the conclusion of the interrogation, she read the notes back to the defendant and gave him an opportunity to make corrections. He made two corrections, initialing each of them, and signed each page of the statement.

The defendant was then formally arrested and booked. He was advised of his right to make a telephone call, and the defendant used that opportunity to telephone one of his parents. An officer overheard a portion of that call, during which the defendant said, "I hit her one too many times. She's dead. I'm sorry. Your son's a killer."[4]

The medical examiner testified that the victim had suffered multiple blows to her face, neck, and chest. He attempted to

---

[3]Subsequent investigation found traces of blood along the route the defendant had taken over the roof, down some back stairs, and out of the building.

[4]The booking officer actually heard the defendant refer to himself as a "murderer," but, on the defendant's motion in limine, the judge ordered that the officer's testimony be modified to use the term "killer" instead. We express no opinion as to whether this ordered substitution of terminology in the officer's testimony was necessary or appropriate.

discern the number of separate blows and points of impact, rendering opinions as to the minimum number of blows inflicted to each area — one to two blows to the forehead, two to three blows to the nose, one to two blows to the right cheek, one to two blows to the left cheek, three blows to the mouth, one blow to the right lower jaw, two blows to the left lower jaw, one blow to the chin, two blows to the neck, and five to six blows to the chest.[5] In addition to extensive bruising and swelling of her face, the victim's front teeth had been knocked out, and she had suffered multiple fractures to her nose, cheek, and jaw. The examiner opined that it would take significant force to inflict such injuries. There was also hemorrhaging in the area of her back and the back of her head, consistent with being struck while lying on the floor. The medical examiner opined that these multiple injuries had caused the victim to reach her "pain threshold" and go into shock, which ultimately resulted in the victim's death.

The defendant testified at trial, denying that he had ever struck the victim at any time prior to the night of her death. He claimed that they had been arguing that day, triggered by the victim's failure to attend her methadone clinic for two days in a row. In the course of those arguments, the victim had told him to move out. He had packed his belongings and loaded them into his car, but had gone back to the apartment to leave a note for the victim to try and make up. He had been drinking, and he passed out on the bed in the apartment at around 5 P.M. He claimed that he awoke to find the victim on top of him, grabbing at him. He "just started swinging," while still in a "stupor," and the next thing he knew the victim was on the floor bleeding, moaning, and unconscious. He "freaked out" and made his escape out the window when he heard yelling outside. As to the statement he gave at the station, he claimed that he "wasn't really paying attention" and remembered little of what he said. He did acknowledge that much of what he told the police was "false." He admitted that the victim had not

---

[5]The medical examiner's calculation that at least nineteen to twenty-four separate blows were inflicted on the victim corresponds with the neighbor's estimate of hearing approximately thirty-five separate "banging sounds" during the course of the attack.

pulled a knife on him, and said that he did not know why he had told the police the story about the knife.[6] On cross-examination, he acknowledged that, despite his allegedly inebriated condition, he had had no problem traversing his way along the roof ledge, and that he had had the presence of mind to tell his former girl friend a lie about being attacked by a stranger. He also acknowledged that, as a teenager, he had received training in boxing, from which he had learned how to inflict damaging blows to an opponent without injury to his own hands. Despite the multiple fractures to the victim's face and jaw, the defendant had suffered no injury whatsoever to his hands (from which the jury could infer that the blows had been landed with some degree of precision and skill, and not as part of the drunken flailing about that the defendant had described).

2. *Discussion.* a. *Statutory right to a postarrest telephone call.* The defendant contends that he was "in custody" by 2:45 A.M. during his interrogation at the police station, but that he was not advised of his right to use the telephone or allowed to make any telephone call until sometime after he was formally arrested and booked at 4 A.M. He contends that the police violated "both prongs" of G. L. c. 276, § 33A, as he was not advised of his right to use the telephone "forthwith" nor allowed to use the telephone within the prescribed one-hour period. G. L. c. 276, § 33A. For this alleged intentional violation of the statute, the defendant contends that his statement to the police should have been suppressed. See *Commonwealth* v. *Scoggins,* 439 Mass. 571, 578 (2003), citing *Commonwealth* v. *Johnson,* 422 Mass. 420, 429 (1996).

We have recently clarified that the telephone rights provided by G. L. c. 276, § 33A, are triggered by a defendant's formal arrest, not by the "custodial" nature of any prearrest interrogation. *Commonwealth* v. *Rivera,* 441 Mass. 358, 374-375 (2004).[7] Here, the defendant was arrested and booked at the

---

[6]A search of the apartment subsequent to the defendant's statement had uncovered no knife. The jury could infer that the defendant's version of events at trial had changed (yet again) because he knew by then that the version about being attacked with a knife did not comport with the evidence found at the scene.

[7]The defendant's brief on appeal was submitted prior to the court's decision in *Commonwealth* v. *Rivera,* 441 Mass. 358 (2004).

conclusion of the interrogation, and he was advised of his right to make a telephone call early on during the booking process. He used the telephone shortly thereafter. As such, there was no violation of G. L. c. 276, § 33A.[8]

b. *Failure to make an electronic recording of the interrogation.* The defendant contends that the police had the requisite equipment with which to make an electronic recording of his interrogation, and that his statement should be suppressed for their unjustified failure to preserve the interrogation in this fashion. We recently considered whether to impose such a recording requirement as a prerequisite to the admissibility of a defendant's statement, and have, consistent with our past cases, declined to do so. *Commonwealth* v. *DiGiambattista, ante* 423, 441-442, 445 (2004) (*DiGiambattista*).[9] See *Commonwealth* v. *Burgess*, 434 Mass. 307, 314 (2001); *Commonwealth* v. *Larkin*, 429 Mass. 426, 438-439 n.10 (1999); *Commonwealth* v. *Diaz*, 422 Mass. 269, 271-273 (1996). We did, however, announce that, in the case of a custodial interrogation or an interrogation conducted at a place of detention, a defendant would be entitled (on request) to a jury instruction on the significance of the failure to preserve the entire interrogation by means of electronic recording. *DiGiambattista, supra* at 447-448.

The entitlement to a jury instruction announced in *DiGiambattista* was an exercise of our power of superintendence "to regulate the presentation of evidence in court proceedings," *id.* at 444-445, not a new constitutional rule. In prior cases announcing new rules or requirements in the exercise of our

---

[8]This case does not present any "manipulation of the time of arrest to delay providing the telephone advisement." *Commonwealth* v. *Rivera, supra* at 375 n.13. The interrogation of the defendant commenced promptly on his arrival at the police station, and lasted approximately two hours (including the time for reviewing, correcting, and signing a written version). Nothing in this sequence or timing suggests "manipulation" in order to prevent the defendant from making a telephone call. *Id.* At oral argument, counsel suggested that such "manipulation" could be found in the officers' decision to continue the interrogation after the five-minute break, as that break provided a natural stopping point during the interrogation that could have been used to arrest and book the defendant and thereby accord him his notice and opportunity to use the telephone. We reject the suggestion that merely resuming an interrogation following a routine break constitutes "manipulation of the time of arrest." *Id.*

[9]The defendant's brief on appeal was filed prior to our decision in *Commonwealth* v. *DiGiambattista, ante* 423 (2004).

superintendence power, we have declined to give the new rule or requirement retroactive effect. See, e.g., *Commonwealth* v. *Rosario*, 422 Mass. 48, 56 (1996) (prospectively adopting six-hour safe harbor period for interrogation postarrest and prearraignment); *Commonwealth* v. *Young*, 401 Mass. 390, 398 (1987) (prospectively requiring individual juror voir dire on subject of racial prejudice in cases involving interracial murder); *Commonwealth* v. *Sanders*, 383 Mass. 637, 640-641 (1981) (prospectively requiring individual juror voir dire on subject of racial prejudice in cases involving interracial rape). See also *Commonwealth* v. *Day*, 387 Mass. 915, 920-921 & n.10 (1983) (prospectively imposing "beyond a reasonable doubt" as burden of proof for establishing knowing and intelligent waiver of constitutional rights).[10] The rule of *DiGiambattista* is also to be applied only prospectively, i.e., to trials occurring after the issuance of that decision. Indeed, in earlier cases addressing the possibility that this court might in the future require that interrogations be recorded as a prerequisite to introducing the defendant's statement in evidence, this court expressly announced that any such rule would be prospective only. See *Commonwealth* v. *Ardon*, 428 Mass. 496, 498 (1998); *Commonwealth* v. *Fernandes*, 427 Mass. 90, 98 & n.3 (1998). Consistent with that prior assurance, the rule mandating jury instructions on the subject (adopted in lieu of a rule excluding unrecorded statements) will not be applied retroactively. The

---

[10]The defendant seeks to invoke the standards for retroactive application that we have used when adopting new criminal rules that stem from a constitutional requirement. In those cases, we have allowed the defendant to claim the benefit of the new rule if his case was pending on direct appeal at the time the new rule was announced, and he had either preserved the issue at trial or qualified for the so-called clairvoyance exception. See *Commonwealth* v. *D'Agostino*, 421 Mass. 281, 284 & n.3 (1995); *Commonwealth* v. *Figueroa*, 413 Mass. 193, 201-203 (1992), *S.C.*, 422 Mass. 72 (1996). See also *Griffith* v. *Kentucky*, 479 U.S. 314, 322 (1987) (newly declared constitutional rule must be applied to cases pending on direct review). Here, however, we are not dealing with a rule that has its source in any constitutional mandate. When announcing a new common-law rule, a new interpretation of a State statute, or a new rule in the exercise of our superintendence power, there is no constitutional requirement that the new rule or new interpretation be applied retroactively, and we are therefore free to determine whether it should be applied only prospectively. See *Murtishaw* v. *Woodford*, 255 F.3d 926, 956 (9th Cir. 2001), cert. denied, 535 U.S. 935 (2002); *Sanders* v. *Fair*, 728 F.2d 557, 558-559 (1st Cir.), cert. denied, 467 U.S. 1254 (1984).

defendant is not entitled to a new trial in order to obtain the benefit of the *DiGiambattista* instruction.[11]

c. *Prosecutor's closing argument.* In his closing argument, defense counsel urged the jury to find that the defendant was guilty of manslaughter, not murder. In doing so, he sometimes employed the legal terminology that is customarily used to differentiate between those two crimes — e.g., that the defendant acted in the "heat of passion," in response to "reasonable provocation," and "without legal malice." At other times, he resorted to more colloquial, descriptive terms to illustrate his theory that the defendant had responded to the victim's attack and had acted without any intent to harm the victim or even any awareness of what he was doing — e.g., that he "woke up with somebody upon him and lashed out," that "[the victim's] upon him and he snaps," that it was "[a]n out of control attack, the attack of somebody who was just out of their mind, didn't know what they were doing, just lashing back at somebody who was upon them," "an explosion," the "acts of a man set upon in a drunk who lost control." He repeatedly characterized the Commonwealth's burden as a burden to prove that the defendant acted "in cold blood."

The prosecutor's closing argument reviewed the evidence that would undermine the defendant's claim of how and why the attack on the victim occurred (in particular, how it was contradicted by the neighbor's testimony, and by the defendant's

---

[11]Although not necessary to our decision, we note that the jury were made aware of the ramifications of there being no recording. Defense counsel's cross-examination of the interrogating officers elicited that they had chosen not to record the interrogation, despite the fact that recording equipment was readily available. Defense counsel's closing argument highlighted to the jury the fact that the written statement produced over the course of that interrogation took only twenty minutes to read, while the interrogation itself had lasted almost two hours, suggesting to the jury that the statement was woefully incomplete. He asked the jury to consider why the interrogation had not been recorded, noting that a recording would have allowed them to ascertain "what did the defendant actually say, how he was saying it, how he was acting," and whether he was "in his full faculties when he was speaking to the police." While the defendant did not have the additional benefit of the *DiGiambattista* instruction, the jury were not uninformed regarding this issue. In light of the overwhelming evidence against the defendant (including his acknowledgment at trial that he had beaten the victim to death), we are convinced that a *DiGiambattista* instruction would have had no impact on the jury's decision.

own statement to the police), and, toward the end, included the following summary: "His actions that night were not just what he wants you to believe, manslaughter, simply manslaughter, reckless conduct, or heat of passion, or response to some sort of provocation, reasonable response or reasonable provocation or even sudden combat. This was murder." At the conclusion of the argument, defense counsel objected to the prosecutor's use of the term "reasonable response," pointing out that manslaughter did not consist of a "reasonable response" to provocation, but rather of "an unreasonable or excessive response to a reasonable provocation." The judge noted that, in his view, both counsel had made references to the law that were not entirely accurate, and expressed confidence that his instructions would satisfactorily address the legal issues.

The judge proceeded with instructions to the jury that accurately identified and explained the distinctions between the theories of murder in the first degree, murder in the second degree, voluntary manslaughter, and involuntary manslaughter. In doing so, he gave an accurate definition of "reasonable provocation," and repeatedly emphasized that the Commonwealth had the burden to prove the absence of mitigation beyond a reasonable doubt in order to convict the defendant of murder. He also, at many different points, advised the jury that they were to accept and apply the principles of law as he gave them, and that they could not convict the defendant of any crime unless the Commonwealth had proved all of the elements of that crime "as I have explained them." As he had promised the jury from the outset of the trial, he also provided them a written copy of his instructions, and explained to the jurors the procedure they were to use if they had any questions about the law.[12]

On appeal, the defendant contends that the prosecutor's reference to the concept of a "reasonable response" misstated the law and potentially misled the jury into thinking that they could not return a manslaughter verdict unless the defendant's "response" to the victim was "reasonable." In order to decide whether the prosecutor's inaccurate reference to "reasonable

---

[12]During deliberations, the jury did not ask any questions or seek clarification of any of the judge's instructions.

response" warrants granting the defendant a new trial, we consider whether there was a timely objection, whether the inaccuracy went to a collateral issue or to the "heart of the case," what steps the judge took to mitigate the prosecutor's mistake, and whether it would "possibly make a difference in the jury's conclusion." See *Commonwealth* v. *Kelly*, 417 Mass. 266, 271 (1994), and cases cited.

Here, the first two factors weigh in favor of the defendant. There was an objection made at the conclusion of the prosecutor's argument, so the issue was preserved. *Id.* at 270 n.6, and cases cited. The distinction between murder and manslaughter was at the heart of the defense, so the mistake cannot be characterized as merely collateral. However, the final two factors weigh heavily in favor of the Commonwealth. The judge's instructions on the distinction between murder and manslaughter, including the concept of "reasonable provocation," were accurate and comprehensive, with repeated admonitions to the jury that they were to accept and apply the law as he defined it. The defendant protests that the judge's final instructions never specifically told the jury to ignore counsels' descriptions of those legal principles, and argues that the final instructions were therefore inadequate to cure any mistaken impression that may have resulted from the prosecutor's reference to "reasonable response." We look, however, at both the final instructions and at the instructions given to the jury during the course of the entire trial. From general instructions given to the potential jurors during empanelment, through initial instructions to the jury on their selection, limiting instructions during the presentation of evidence, and the judge's final instructions, the jurors were repeatedly and emphatically told that the judge would provide them with all instructions on the law, and he assured them that he would give them those instructions both orally and in writing. In his initial instructions prior to the opening statements, the judge expressly told the jurors that "[i]f either of the attorneys should say anything at any time that is inconsistent with or contrary to any instruction of law that I give you," the jurors would have to "accept and follow" the judge's instructions, even if they disagreed with those instructions. Thus, from the outset, the jury had been told that

they should look solely to the judge for an explanation of the applicable legal principles, and to ignore any differing explanations suggested by either of the attorneys.[13] That the judge's final instruction did not include any express correction of the prosecutor's mischaracterization does not mean that the instruction was inadequate to cure any confusion caused by that mischaracterization. See *Commonwealth* v. *Atkins*, 386 Mass. 593, 602 (1982).

On the final (and most important) factor, we are satisfied that the prosecutor's statement would not have made any difference to the jury's determination. In context, the prosecutor's misstatement appears to be more a slip of the tongue, immediately corrected by a correct reference to "reasonable provocation." It occurred as part of a list that was intended to operate as a summary of the defendant's various contentions, not as a legal definition of the concept of mitigation. Nowhere in his closing argument did the prosecutor articulate the theory that the defendant's "response" to the circumstances had not been "reasonable," or otherwise suggest to the jury that they should be evaluating the reasonableness of the defendant's actions. Indeed, the prosecutor's argument focused on countering the entire factual premise of the defendant's manslaughter theory, contending that there was no "provocation" whatsoever, not on whether any such provocation — or any "response" to it — would qualify as "reasonable." The Commonwealth's theory was that the defendant had beaten the victim on account of her insistence that he move out of the apartment, relying on the neighbor's observation of them arguing over that subject as they proceeded upstairs immediately prior to the fatal attack. The focus of the prosecutor's closing argument was to identify the evidence that undermined the defendant's completely different version of the events, i.e., his claim that the victim had set upon

---

[13]Both defense counsel and the prosecutor reinforced this message during their respective closing arguments, with repeated references to the fact that the judge would be providing the jury with explanations and definitions of the governing legal principles. With specific reference to the definitions of malice and the theories of provocation or heat of passion that would negate malice, defense counsel told the jury that "the judge is going to define these things in great detail for you," and the prosecutor advised the jury to "[l]isten very carefully" to the judge's instruction on "heat of passion," and explained that he would not go "too far" into the subject of malice "because that's the judge's job."

him while he was asleep, causing him to lash out uncontrollably. In light of the argument as a whole, the judge's comprehensive oral and written instructions on the subject, and the repeated admonitions that the jurors should accept the legal definitions provided by the judge, we are satisfied that the prosecutor's fleeting reference to the concept of a "reasonable response" to provocation would not have affected the jury's understanding of the distinction between manslaughter and murder.

d. *G. L. c. 278, § 33E.* We have reviewed the record in its entirety and see no grounds warranting relief under G. L. c. 278, § 33E. In arguing that we should reduce the verdict to murder in the second degree, the defendant assumes that the jury's verdict must have rested on a theory of third prong malice, and he then contends that a conviction of murder in the first degree based on extreme atrocity or cruelty should be reduced if the evidence does not suggest either first or second prong malice. We reject both the factual and the legal premise of that argument. Here, there was ample evidence from which the jury could have inferred that the defendant intended to cause the victim grievous bodily harm, and the protracted nature of the beating, focused with both precision and considerable force on the victim's face and head, would permit the inference of an intent to kill. Even assuming that this jury based their verdict on a theory of third prong malice, we reject the defendant's suggestion that third prong malice is a less weighty form of malice, or that it somehow makes a conviction of murder in the first degree less appropriate. Although murder in the first degree by way of deliberate premeditation can be predicated only on a specific intent to kill, see *Commonwealth* v. *Judge,* 420 Mass. 433, 441 (1995), murder in the first degree by way of extreme atrocity or cruelty can be predicated on first, second, or third prong malice. See *Commonwealth* v. *Diaz,* 426 Mass. 548, 553 (1998); Model Jury Instructions on Homicide at 12 (1999). Here, there was abundant evidence of malice, and overwhelming evidence that the killing had been committed with extreme atrocity or cruelty, with the victim literally dying from the pain inflicted over the course of a prolonged beating while she lay "groaning" on the floor. This is not a case where the evidence, "although technically sufficient to support the jury's verdict,

points to a lesser crime." *Commonwealth* v. *Rolon*, 438 Mass. 808, 821 (2003).

*Judgment affirmed.*