# United States Court of Appeals

## For the First Circuit

No. 07-2059

STEPHEN DAGLEY,

Petitioner, Appellant,

v.

LOIS RUSSO,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Torruella, John R. Gibson,[*] and Lipez,
<u>Circuit Judges</u>.

<u>Brownlow M. Speer</u>, with whom the <u>Committee for Public Counsel
Services</u> was on brief, for petitioner.
<u>Scott Katz</u>, Assistant Attorney General, with whom <u>Martha
Coakley</u>, Attorney General, was on brief, for respondent.

August 15, 2008

---

[*] Of the Eighth Circuit, sitting by designation.

**LIPEZ, Circuit Judge**.  Petitioner Stephen Dagley was convicted in the Essex County Superior Court in Massachusetts of first degree murder and sentenced to a mandatory term of life imprisonment without the possibility of parole.  After exhausting his state court appeals, petitioner filed a 28 U.S.C. § 2254 habeas petition challenging his detention.  He asserted that a prosecutor's prejudicial misstatement during closing arguments, and the court's subsequent failure to directly cure the misstatement, resulted in a fundamentally unfair trial and the infringement of his right to due process under the Fourteenth Amendment.  The district court denied relief and Dagley appeals.  We affirm.

## I.

We recite only those facts necessary to resolve Dagley's claim, as they were determined in the state proceedings.  Pursuant to 28 U.S.C. § 2254(e)(1), we presume the correctness of these findings.[1]  Dagley does not dispute any of the state courts' findings of fact.

---

[1] In full, 28 U.S.C. § 2254(e)(1) states:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

The petitioner was indicted for murdering the victim in September 2000. According to Dagley's neighbor downstairs, the killing followed an argument between Dagley and the victim, his girlfriend, earlier in the evening in which she told the petitioner that he would have to move out of their apartment. The neighbor recalled Dagley and the victim entering their apartment while still arguing. He heard more yelling and screaming from the apartment, then periodic banging sounds, like a "hammer hitting the floor." The initial period of yelling and banging lasted approximately twenty to twenty-five minutes, and the banging continued intermittently for another ten minutes thereafter. The banging was sufficiently powerful to cause ceiling tiles in the neighbor's apartment to drop, and some plaster also loosened and fell. The neighbor contacted both the building owner and the police regarding the incident, and the police arrived within minutes to find the victim lying unconscious on the floor of her apartment with a large pool of blood around her head. Having suffered numerous blows to her face, neck, and chest, causing multiple fractures, extensive bruising and swelling, hemorrhaging in the back of her head and back, and a lapse into a state of shock, she was pronounced dead, despite attempts by emergency medical personnel to revive her.

The police inspected the scene, finding bloody footprints (later matched to the soles of the petitioner's shoes) in a path toward the window. The window screen appeared to have been kicked

out, with the perpetrator having escaped onto the roof. The police obtained Dagley's name from the downstairs neighbor and alerted other officers that they were on the lookout for the petitioner.

Very early the next morning, a Beverly, Massachusetts police officer spotted the petitioner at the home of his ex-girlfriend in Beverly and contacted the Salem police. When the Salem police arrived at the scene, they asked if the petitioner would accompany them to the police station for questioning. He agreed. The petitioner was not arrested, nor restrained. On their way to the station, he complained to the police that he was in pain, stating that he had been "jumped by people" earlier in the night.

When they arrived at the station around 1:55 A.M., the police read Dagley his <u>Miranda</u> warnings. After reciting several different versions of the night's events, the petitioner acknowledged that he had gone back to the victim's apartment to try to "make up" with her, and had "lost control." He claimed that after being punched and kicked by the victim, he punched her twice quickly, knocking her down, and then struck her a third time when she was on the floor. He described the victim as "just groaning" on the floor with her hands over her face. Upon hearing the police arrive, he left through the window and over the roof on foot.

After confessing to the officers at the police station, the petitioner also acknowledged that, although he had been

-4-

confronted by some people earlier in the day, he had not been attacked by them. The interview lasted approximately two hours. After its conclusion, Dagley was given an opportunity to correct the notes taken during the interrogation. Dagley was then formally arrested and booked.

At trial, Dagley again admitted to having killed the victim, but sought to convince the jury that his use of force was an instinctual response to the victim's unprovoked attack on him. He testified that after engaging in an argument with the victim about their living arrangement and her failure to attend her methadone clinic, he packed his belongings and prepared to move out of the apartment. After loading his car, he explained that he returned to the apartment to leave a note for the victim in hopes of "mak[ing] up." Having been drinking previously, Dagley claimed to have passed out on the bed in the apartment. He testified that when he awoke the victim was "on top of him, grabbing at him." Instinctively, and still in a "stupor," he said he "started swinging" at the victim. According to his testimony, the next thing he knew the victim was on the floor bleeding and unconscious. In response, he claims to have "freaked out" and escaped out the window because he heard yelling outside the building.

In his closing argument, Dagley's counsel asserted that because Dagley acted instinctually in response to a "reasonable provocation," he should only be found guilty of manslaughter, not

murder. Counsel repeatedly stated that the Commonwealth was required to prove that the petitioner acted "in cold blood" in order to obtain a murder conviction.

The prosecutor urged the jury to reach a different conclusion. Insisting that the evidence presented to them undermined Dagley's version of the events, the prosecutor stated the following near the end of the closing argument:

> His [the petitioner's] actions that night were not just what he wants you to believe, manslaughter, simply manslaughter, reckless conduct, or heat of passion, or response to some sort of provocation, <u>reasonable response</u> or reasonable provocation or even sudden combat. This was murder.

Commonwealth v. Dagley, 816 N.E.2d 527, 534 (Mass. 2004) (emphasis added). After the prosecutor completed his argument, Dagley's counsel objected to the above portion, asserting that the use of the phrase "reasonable response" was legally inaccurate as manslaughter does not require the petitioner's response to be reasonable. Instead, defense counsel noted that manslaughter is emphatically "an unreasonable or excessive response to a reasonable provocation." Id. at 535.

In response, the judge noted that both counsel had inaccurately stated the law at points during the trial and that any confusion would be remedied in his instructions to the jury. In those instructions, the judge provided accurate legal distinctions between murder and manslaughter, including a definition of

-6-

"reasonable provocation," and noted that the "Commonwealth has the burden to prove the absence of mitigation beyond a reasonable doubt in order to convict the [petitioner] of murder."[2]  Id.  Further,

---

[2] The judge's instruction on "reasonable provocation" was as follows:

> In order to prove the petitioner acted with malice, the Commonwealth must prove beyond a reasonable doubt the absence of mitigating factors [one of which is heat of passion upon reasonable provocation]. . . .
>
> Reasonable provocation is provocation of the type which would be likely to produce in a reasonable person in the circumstances known to the petitioner such a state of passion, anger, fear, fright, or nervous excitement as would overcome his capacity for reflection or restraint, and did actually produce such a state of mind in the petitioner.
>
> The provocation must be such that a reasonable person would have become sufficiently provoked and would not have cooled off by the time of the killing.
>
> In addition, there must be a causal connection between the provocation, state of passion, and the killing.  The killing must follow the provocation before there is sufficient time for the emotion to cool and must be the result of the state of mind induced by the provocation rather than a preexisting intent to kill or injure.
>
> Mere words, no matter how insulting or abusive standing alone do not constitute reasonable provocation.  Physical contact, even a single blow, may amount to a reasonable provocation.  Whether the contact is sufficient will depend on whether a reasonable person under similar circumstances would have been provoked to act out of emotion rather than reasoned reflection.
>
> The heat of passion must also be sudden; that is, the killing must have occurred before a reasonable person would have regained control of his emotions.

the judge repeatedly instructed the jury that they were required to apply the law as the judge gave it to them, and that they could only convict the petitioner of a crime if they found that the Commonwealth had proven every element of that crime. The court provided written instructions to the jury, which at no point asked for clarification from the judge before returning a conviction for first-degree murder.

The SJC affirmed the conviction on appeal. Dagley, 442 N.E.2d at 537. Dagley's petition for certiorari to the United States Supreme Court was denied shortly thereafter in March 2005. Dagley subsequently filed a petition for writ of habeas corpus in December 2005, raising a single claim. He argued that the prosecutor's inclusion of the phrase "reasonable response" in his closing argument, which represents a misstatement of the definition of manslaughter, and the court's failure to specifically correct the error, deprived him of his right to due process under the Fourteenth Amendment.

In June 2007, the District Court of Massachusetts denied Dagley's petition after briefing by the parties and a non-evidentiary hearing. In a thorough and thoughtful opinion, the court found that the prosecutor's legally incorrect use of the

---

If the Commonwealth has not proved beyond a reasonable doubt the absence of heat of passion upon reasonable provocation, the Commonwealth has not proved malice.

-8-

phrase "reasonable response" during closing argument in describing the elements of manslaughter, and the trial court's failure to correct explicitly that error in its jury instructions, did not violate Dagley's due process rights by rendering the trial fundamentally unfair.  The district court subsequently issued a Certificate of Appealability on Dagley's due process claim.

**II.**

We review a district court's denial of a petitioner's habeas claim de novo.  Delaney v. Bartee, 522 F.3d 100, 102 (1st Cir. 2008).  Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. 2254, we may issue the writ if the SJC's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); see Teti v. Bender, 507 F.3d 50, 56 (1st Cir. 2007).  To be "contrary to" clearly established Supreme Court law, a state court must "appl[y] a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  Alternatively, a state court's decision runs afoul of the "unreasonable application" prong if the court either "identifies the correct governing legal

rule from th[e] [Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or "unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407. The rule relied upon by the petitioner for relief must be "clearly established law as determined by th[e] [Supreme] Court," which refers to holdings, not dicta. Yarborough v. Alvarado, 541 U.S. 652, 660-61 (2004).

**III.**

**A. Petitioner's Claim**

Relying on the Supreme Court's decision in Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974), Dagley asserts that the prosecutor's closing argument, in which he stated that "the petitioner wants you to believe [his actions] were some sort of . . . reasonable response or reasonable provocation or even sudden combat," contributed to a violation of his due process rights under the Fourteenth Amendment. In Donnelly, the Court recognized that a prosecutor's closing argument could be sufficiently prejudicial so as to constitute a deprivation of a petitioner's constitutional rights. See id. Applying that decision to this case, Dagley argues that the prosecutor's mention of a "reasonable response" requirement gravely misstated the definition of manslaughter, thereby misleading the jury into believing that such a response is

-10-

a required element of manslaughter and creating a fundamentally unfair proceeding.

According to the petitioner, the harmful effect of the prosecutor's misstatement is clear when one examines Dagley's trial tactics. At trial, Dagley's sole defense was a claim that because his actions were a response to a reasonable provocation by the victim, the government could not establish that Dagley acted with malice, a necessary element of murder. See, e.g., Commonwealth v. Gladney, 607 N.E.2d 750, 755 (Mass. 1993); Commonwealth v. Boucher, 532 N.E.2d 37, 39 (Mass. 1989). Instead, Dagley argued, the government could only prove that he committed manslaughter. In Massachusetts, "if a person kills another in the heat of passion, which is occasioned by adequate and reasonable provocation, or in sudden combat, then even though that person had an intent to kill, the killing is designated manslaughter and not murder because of the mitigating circumstances." Commonwealth v. Whitman, 722 N.E.2d 1284, 1289 (Mass. 2000) (quoting Commonwealth v. Acevedo, 695 N.E.2d 1065, 1067 (1998)). In cases "[w]here the evidence raises the possibility that the petitioner may have acted on reasonable provocation, the Commonwealth must prove, and the jury must find, beyond a reasonable doubt that the petitioner did not act on reasonable provocation." Acevedo, 695 N.E.2d at 1067. Thus, Dagley asserts, the error went to the heart of his defense.

-11-

Compounding the prosecutor's error, according to Dagley, was the trial judge's inadequate response to the error. Rather than specifically instructing the jury to disregard the prosecutor's misstatement, the judge's response was limited to stating the elements of murder and manslaughter in the course of giving its overall instructions to the jury. Thus, Dagley argues, the taint from the prosecutor's misstatement had not been adequately cured, leaving a lasting impression in the jury's mind that his response had to be "reasonable" in order to satisfy the requirements of manslaughter. He asserts that the combination of the error, which reached to the heart of his defense, and this failure by the trial judge to adequately address and cure such error, made the entire proceeding "fundamentally unfair," thereby amounting to an infringement of his due process rights.

B. **The SJC's Decision**

The SJC evaluated Dagley's prosecutorial error claim under the standard outlined in Commonwealth v. Kelly, which sets forth four factors for determining if a new trial is warranted. 629 N.E.2d 999, 1002 (Mass. 1994).[3] The court examined (1) whether

---

[3] Petitioner concedes that the deferential AEDPA standard of review applies to the SJC's decision. With that concession, the petitioner acknowledges that the Kelly standard applied by the SJC is "as least as protective of the [petitioner]'s rights as its federal counterpart." Leftwich v. Maloney, No. 06-2583, 2008 WL 2600365, at *3 (1st Cir. July 2, 2008); see also Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001) (noting that the AEDPA standard of review applies only when the state court has decided the federal issue). There is no precise federal standard governing due process

-12-

there was a timely objection, (2) whether the inaccuracy went to a collateral issue or to the "heart of the case," (3) what steps the judge took to mitigate the prosecutor's mistake, and (4) whether it would "possibly make a difference in the jury's conclusion." See id.

The SJC found that the first two factors weighed in favor of Dagley. The court acknowledged Dagley's contemporaneous objection to the prosecutor's statement. It also agreed with Dagley that the prosecutorial error went to the heart of Dagley's claim, as it addressed the elements required to establish the crime of manslaughter. However, the SJC concluded that the third and

_____

claims based on a prosecutor's remarks. In its two cases directly addressing the issue, the Supreme Court has concluded, based on the circumstances of each case, that the petitioner's due process rights had not been violated. See Donnelly, 416 U.S. at 642-45 (rejecting due process claim after considering, inter alia, the likely impact of the prosecutor's remark when viewed in relation to the entire trial, and the trial court's instructions to the jury); Darden v. Wainwright, 477 U.S. 168, 178-83 (1986) (rejecting claim based on the individual circumstances of the case, including the trial judge's subsequent instructions to the jury and the strong weight of the evidence against the petitioner); see also United States v. Nelson-Rodríguez, 319 F.3d 12, 38 (1st Cir. 2003) (reciting the standard we use to evaluate whether improper statements made during closing argument are harmful, which focuses on "(1) the severity of the prosecutor's misconduct, including whether it was deliberate or accidental; (2) the context in which the misconduct occurred; (3) whether the judge gave curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendants") (internal quotation omitted). The Kelly standard, which guided the SJC's analysis here, includes all of the factors explicitly considered by the Court in Donnelly and Darden, or close variants thereof, and is also functionally equivalent to our own standard for assessing such claims.

-13-

fourth Kelly factors weighed heavily in favor of the government. On the third factor -- what steps the judge took to mitigate the prosecutor's mistake -- the SJC found that the judge properly instructed the jury on the distinction between murder and manslaughter, including the concept of "reasonable provocation." Although the trial court did not specifically address the prosecutor's mistake by telling the jury to ignore the erroneous statement, the trial judge did assure the jury throughout the course of the trial that he would instruct them, both orally and in writing, on all of the applicable issues of law. According to the SJC, "from the outset [of the trial], the jury had been told that they should look solely to the judge for an explanation of the applicable legal principles, and to ignore any differing explanations suggested by either of the attorneys." Based on its examination of the trial court's conduct, the SJC concluded that the judge's final instructions were adequate to cure any confusion caused by the prosecutor's misstatement of the law, even though the instructions did not specifically refer to the misstatement.

On the fourth factor, the SJC was "satisfied that the prosecutor's statement would not have made any difference to the jury's determination." Reciting the context in which the prosecutor erred, the court suggested that it was nothing more than a "slip of the tongue," meant only to summarize the petitioner's contentions and not as an explicit legal definition of

manslaughter. Further, the SJC noted that the prosecutor's argument was focused primarily on contesting the factual basis of the petitioner's manslaughter defense that there was reasonable provocation for his actions. In sum, the SJC concluded that, viewed in the context of the proceedings as a whole, "the prosecutor's fleeting reference to the concept of a 'reasonable response' to provocation would not have affected the jury's understanding of the distinction between manslaughter and murder." Finding that the third and fourth prongs heavily favored the government, the SJC concluded that there were "no grounds [in the record] warranting relief."

## C. **Clearly Established Supreme Court Precedent**

In assessing whether Dagley has met the high burdens AEDPA imposes on him, we begin -- as a threshold matter -- by determining whether there is clearly established Supreme Court law applicable to Dagley's constitutional claim. On this point, Dagley has rightly pointed us to the Court's decision in Donnelly v. DeChristoforo. See 416 U.S. 637. As noted above, Donnelly stands for the principle that a prosecutor's closing argument may be sufficiently prejudicial so as to constitute a deprivation of a petitioner's due process rights. Id. at 643. Although the Court in Donnelly ultimately rejected the various arguments advanced by the petitioner, noting that the prosecutor's erroneous remark was "ambiguous" and was "followed by specific disapproving

-15-

instructions," it acknowledged implicitly that a prosecutor's remarks may make a petitioner's trial "so fundamentally unfair as to deny him due process." Id. at 645. The Court has applied the principle of Donnelly in other cases, see, e.g., Darden, 477 U.S. at 168, and, as a circuit, we have recognized this principle as "clearly established federal law, as determined by the Supreme Court." Olszewski, 466 F.3d at 53, 59; see also Fahy v. Horn, 516 F.3d 169, 198-99, 202 (3rd Cir. 2008) (applying the Donnelly and Darden due process standard in the context of a habeas claim).

## D. **"Contrary to"**

Next, Dagley must establish that the state-court decision was either "contrary to, or involved an unreasonable application of" Supreme Court precedent. 28 U.S.C. § 2254(d)(1). As noted above, a state-court decision is "contrary to" Supreme Court precedent "if it 'applies a rule that contradicts the governing law set forth in our cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'" Early v. Packer, 537 U.S. 3, 8 (2002) (quoting Williams, 529 U.S. at 405-406). A failure to cite Supreme Court decisions does not itself suggest a state court decision is "contrary to" such precedents, Mitchell v. Esparza, 540 U.S. 12, 16 (2003), "so long as neither the reasoning nor the result of the state-court decision contradicts them," id. (quoting Early, 537 U.S. at 8).

-16-

Here, Dagley has failed to show that either the reasoning or the result of the SJC's decision contradicts the Court's precedents. In Donnelly, the decision upon which Dagley relies, the Supreme Court affirmed the habeas petitioner's conviction in the face of arguments that the prosecutor's remarks during a closing argument deprived the petitioner of his due process rights. 416 U.S. at 638.[4] During the closing arguments in Donnelly, the prosecutor implied that the petitioner had wanted to plead guilty but was denied the opportunity. He then stated that the petitioner and his counsel "hope that you find him guilty of something a little less than first-degree murder."[5] Id. at 640. After the petitioner's counsel promptly objected to the statement and requested a response from the court, the trial judge instructed the jury not to consider any of the closing arguments as evidence,

_____

[4] By affirming the conviction, the Court reversed the decision of a divided panel of this court that granted Donnelly's habeas petition. See DeChristoforo v. Donnelly, 473 F.2d 1236 (1st Cir. 1973).

[5] The context in which this statement was made is relevant to understanding its potential harm to Donnelly. Because Donnelly's co-petitioner had decided to plead guilty to a charge of second-degree murder at the close of the evidence but before final argument, we inferred that the jury might interpret the prosecutor's statement as conveying the false impression that Donnelly had unsuccessfully sought to plead to a lesser charge in the case. Accordingly, we found that the prosecutor's actions deliberately misled the jury on a critical point, thereby depriving Donnelly of a constitutionally fair trial. Donnelly, 416 U.S. at 641-42.

-17-

including, specifically, the prosecutor's misstatement regarding Donnelly's willingness to plea.[6]

The Supreme Court rejected the petitioner's assertion that the remark "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Id. at 643. Reviewing the record as a whole, it warned courts against giving too much weight to stray remarks in the course of a closing argument or assuming that the jury would interpret each and every statement in the most damaging manner possible. Id. at 647. Accordingly, it concluded that "the prosecutor's remark here, admittedly an ambiguous one, was but one moment in an extended trial and was followed by specific disapproving instructions. Although the process of constitutional line drawing in this regard is necessarily imprecise, we simply do not believe that this

---

[6] In Donnelly, the trial court gave the following instruction to the jury:

> Closing arguments are not evidence for your consideration. . . .
> Now in his closing, the District Attorney, I noted, made a statement: "I don't know what they want you to do by way of a verdict. They said they hope that you find him not guilty. I quite frankly think that they hope that you find him guilty of something a little less than first-degree murder." There is no evidence of that whatsoever, of course, you are instructed to disregard that statement made by the District Attorney.
> Consider the case as though no such statement was made.

Id. at 641.

incident made respondent's trial so fundamentally unfair as to deny him due process." Id. at 645.

The SJC's approach in addressing Dagley's claim was similar in substance to the approach taken by the Supreme Court in Donnelly. Evaluating the entire record to determine if the trial was so "fundamentally unfair as to deny him due process," the Court in Donnelly considered, inter alia, the seriousness of the improper remark, the context in which the statement was made, the court's response or curative instructions, and the effect of the statement on the overall proceeding. Id. at 644-47; see also United States v. Ingraldi, 793 F.2d 408, 416 (1st Cir. 1986) (evaluating whether a new trial was required for prosecutorial misconduct by considering the severity of the misconduct, whether it was deliberate or accidental, the context in which it occurred, the likely curative effect of the judge's admonitions and the strength of the evidence against the petitioner). The Kelly factors, which guided the SJC's analysis here, focus on the same considerations explicitly addressed by the Court in Donnelly. See supra n.3. The SJC did not treat one factor as determinative, nor did it ignore any factor the Supreme Court deemed essential to its decision in Donnelly. Accordingly, the SJC's approach was not contrary to Supreme Court precedent. Moreover, because the facts of this case are distinguishable from any Supreme Court decision recognizing a

due process violation, the result is not contrary to any clearly established law.  See Williams, 529 U.S. at 405.

## E.  "Unreasonable Application of"

To meet this standard, a petitioner must establish that the state court decision identifies the correct governing legal principle, but applies it in an objectively unreasonable manner to the facts of the case.  Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003).  The decision must be "more than incorrect or erroneous." Id. at 75.  In addition, where the applicable rule is general in nature, such as the Donnelly fundamental unfairness standard, state courts have "more leeway . . . in reaching outcomes in [their] case-by-case determinations."  Yarborough, 541 U.S. at 664.

The SJC's analysis of the Kelly factors was a reasonable application of established Supreme Court precedent.  The prosecutorial misconduct at issue in this case is less severe than the conduct evaluated by the Court in Donnelly, where the prosecutor, responding to defense counsel's expressed hope that the jury would return a verdict of not guilty in a first-degree murder case, intimated that the petitioner had wanted to plead guilty but was denied the opportunity.  By contrast, the prosecutor's misstatement to the jury in this case was a single, isolated and unelaborated reference in the course of an extended closing argument intended to summarize the petitioner's various assertions. Further, the trial judge addressed the prosecutor's error, albeit

-20-

indirectly, through accurate oral and written jury instructions. In sum, the potential effect that the prosecutor's statement might have had on Dagley's trial does not approach that present in Donnelly.[7]  See Darden, 477 U.S. at 181-82 (finding that a prosecutor's several erroneous and inflammatory statements during closing argument did not "so infect[] the trial with unfairness as

---

[7] As an additional argument on appeal, petitioner claims that the jury's return of a first-degree murder verdict based on a theory of "extreme atrocity or cruelty" rather than "premeditation" suggests that the jury accepted the petitioner's testimony that he did not possess a specific intent to kill the victim, as required under a theory of premeditation, but found first-degree murder appropriate based on the petitioner's failure to meet the erroneous "reasonable response" element.  The logic of this argument is not entirely clear from the petitioner's brief.  Petitioner appears to be arguing that because the jury rejected the prosecutor's version of the crime, it would have accepted the petitioner's manslaughter version had it not been for the prosecutor's "reasonable response" misstatement of the law.  In other words, the misstatement caused the jury to focus predominantly on the conduct of the petitioner rather than his intent, thereby accentuating the significance of the prosecutor's misstatement.  This assertion involves considerable speculation on the part of the petitioner.  Moreover, the underlying logic of the argument is dubious.  In order to convict an individual for first-degree murder under a theory of extreme atrocity or cruelty, the jury still must make some determination about the petitioner's intent.  See, e.g., Commonwealth v. Cunneen, 449 N.E.2d 658, 664-65 (Mass. 1983) (discussing the intent required for a conviction of murder in the first degree with extreme atrocity or cruelty).  Thus, the jury's focus was not solely on the petitioner's conduct and whether it could be deemed a reasonable response to provocation.  Furthermore, the court instructed the jury to focus on how the petitioner committed the crime in its instruction on first-degree murder by extreme atrocity and cruelty.  To suggest that it was only the prosecutor's misstatement that focused the jury on how the petitioner committed the crime contradicts the explicit instructions that the court gave.

to make the resulting conviction a denial of due process" (quoting Donnelly, 416 U.S. at 637)).

Most notable for purposes of Dagley's claim is the SJC's discussion of the third factor -- the mitigating steps the trial court took in response to the prosecutorial error. Although Dagley argues that the trial court's failure to specifically address the prosecutor's misstatement to the jury made the statement more prejudicial overall than the one in Donnelly, where the court directly told the jury to disregard the prosecutor's misstatement, the SJC's conclusion regarding the trial court's handling of the prosecutor's misstatement is far from unreasonable. As the SJC points out, the trial judge took reasonable steps to clarify the prosecutor's misstatement of the law by providing both oral and written instructions to the jury correctly explaining the different elements of murder and manslaughter. This explanation followed statements by the judge on several occasions throughout the trial to the jury that they would be given the proper legal instructions orally and in writing at the close of the proceedings. Although a direct instruction responding to a prosecutorial error may have been preferable, the SJC was correct in finding that such an instruction was not required in this case. The SJC's conclusion on this factor -- that the judge's steps to remedy the mistake were sensible under the circumstances -- does not represent an unreasonable application of Donnelly.

**Affirmed**.

-22-